## COMMONWEALTH IMPROVEMENT CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4639.

Circuit Court of Appeals, Third Circuit.

March 17, 1932.

Ellis A. Ballard, William R. Spofford, and Schofield Andrews, all of Philadelphia, Pa., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and Morton K. Rothschild and Sewall Key, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and James K. Polk, Jr., and Harold F. Noneman, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., of counsel), for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and JOHNSON, District Judge.

DAVIS, Circuit Judge.

This petition for review concerns income and excess profits taxes for the year 1920. The extraordinary situation here arises out of the relation of the taxpayer to the estate of P. A. B. Widener.

In 1912, Mr. Widener, desiring to place a lien on his fortune to insure an endowment to the Widener Memorial School for Crip-

pled Children, which was his favored charity, transferred all of his stocks and securities, except those of Pennsylvania corporations, to the taxpayer Commonwealth Improvement Company, a Pennsylvania Corporation, whose charter he had purchased for this purpose. In return, the taxpayer issued and transferred to Mr. Widener all of its stock and bonds, aggregating a par value of $25,000,000.

Mr. Widener executed a deed of trust, and delivered to the trustee $4,000,000 of the taxpayer's bonds to be held as a perpetual endowment for the charity. Mr. Widener died three years thereafter, and as a consequence of the situation, whereby the taxpayer held all of his stocks and securities save those of Pennsylvania companies, the estate paid no death taxes to any state other than Pennsylvania.

After Mr. Widener's death, the capital structure of the taxpayer was reduced to $2,-000,000 in stock, and $4,000,000 of debentures, the latter being the same deposited with the trustee for the charity. The remainder of the stock and bonds was canceled and destroyed. The reduction of the capital structure was effected by transferring from the taxpayer to the trustee of the Widener estate securities equal in value to the stock and bonds canceled, any difference in value being entered on the books of each.

Among the stocks transferred to the taxpayer in 1912 were 225,000 shares of the British-American Tobacco Company, having on March 1, 1913, a value of $5,315,625, or $23.625 per share. In 1919, the British-American Tobacco Company gave the privilege to subscribe to one share of new stock at $4.3525 for every three shares held by a stockholder. The taxpayer, taking full advantage of its right, purchased 75,000 shares for $326,437.50.

In 1920, it was deemed advisable to substitute certain real estate bonds of the Widener estate for the $4,000,000 of debentures of the taxpayer which were held in trust for the charity. By this transaction, the estate again became the owner of the remaining outstanding debentures of the taxpayer.

And, thus, came about the unusual situation which brings us to the issue in this case. The trustees of the Widener estate owned the entire interest in the taxpayer, and completely dominated it. The following transaction was arranged: The taxpayer transferred 225,000 shares of the stock of the British-American Tobacco Company to the trustees of the estate in consideration of the estate

surrendering the $4,000,000 of debenture bonds of the taxpayer (being the same bonds formerly held by the trustee for charity) and certain other transactions totaling $1,287,500. Hence, the 225,000 shares of the British-American Tobacco Company were exchanged for $5,287,500 or $23.50 per share.

In its income tax return for 1920, the taxpayer claimed as a loss the difference between the March 1, 1913, value of $5,315,625 for 225,000 shares and the amount of $5,287,500 realized by the exchange with the Widener estate. But the Commissioner of Internal Revenue made the following adjustment in the March 1, 1913 value:

| | |
|---|---:|
| 225,000 shares; March 1, 1913 value | $5,315,625.00 |
| 75,000 shares; acquired on exercise of stock rights for | 326,437.50 |
| 300,000 shares | 5,642,062.50 |
| 1 share | 18.806875 |
| 225,000 shares | 4,231,566.88 |

According to the determination of the Commissioner, the exchange resulted in a profit of $1,055,953.12, instead of the loss claimed by the taxpayer, and a deficiency in income tax for 1920 of $294,388.42. The Board of Tax Appeals sustained the Commissioner's decision. 20 B. T. A. 1189.

Section 213 (a) of the Revenue Act of 1918 (40 Stat. 1065) provides that gross income includes gains, profits, and income derived from dealings in property. Here there has been an exchange of property resulting apparently in a large profit which would obviously be taxable. Section 202 (b) of the Revenue Act of 1918 (40 Stat. 1060).

The taxpayer, itself, concedes that it and the estate are distinct beings in contemplation of the law and subject to the burdens thereof. But the taxpayer asks this court to deny the government's right to tax gains, profits, or income that are illusory, and do not exist in fact.

By determining whether this court has the power to examine this exchange of property for its substance, we come to the ultimate questions in this case: (a) Is there any real gain or loss to be taxed? And (b) did Congress intend to tax that which is income in form only?

Counsel for the taxpayer have offered two cases, which they frankly admit do not control this case on its facts, to show that we may examine the transaction here concerned for its substance as an incidence to income taxation. Southern Pacific Company v. Lowe,

247 U. S. 330, 38 S. Ct. 540, 542, 62 L. Ed. 1142; Gulf Oil Corporation v. Lewellyn, 248 U. S. 71, 39 S. Ct. 35, 63 L. Ed. 133.

In the Southern Pacific Company Case, the plaintiff railway company owned all the stock of, and leased, a second railroad. The property and funds of the subsidiary company were in the possession of the plaintiff. In 1913, the plaintiff caused the subsidiary to declare a dividend, on income accumulated prior to 1913, payment of which was effected by a credit to the plaintiff on its books. The Supreme Court held that the dividend was not subject to an income tax as the income out of which it had been declared, although earnings accumulated prior to the effective date of the Sixteenth Amendment were taxable, under the peculiar facts of the case, had substantially accrued to the plaintiff before the declaration of the dividend. The principle of the case was extended to Gulf Oil Company v. Lewellyn, supra, wherein the holding corporation which received the dividend was the owner of all the stock of a subsidiary and engaged in a single enterprise, but was not the lessee, and neither conducted the business nor was in possession of the funds of the subsidiary.

█ The point comes down to this: Did Congress intend that "income" should be used as a word of art or in a real and practical sense? In the Southern Pacific Case, the Supreme Court said: "We base our conclusion in the present case upon the view that it was the purpose and intent of Congress, while taxing 'the entire net income arising or accruing from all sources' during each year commencing with the 1st day of March, 1913, to refrain from taxing that which, in mere form only, bore the appearance of income accruing after that date, while in truth and in substance it accrued before; and upon the fact that the Central Pacific and the Southern Pacific were in substance identical because of the complete ownership and control which the latter possessed over the former, as stockholder and in other capacities."

The principle announced in those two cases of the Supreme Court controls this case. This court will examine the exchange of property between the taxpayer and the Widener estate to determine if it in fact produced income.

█ At the time of the exchange, the regulations of the Treasury Department prescribed the value of March 1, 1913, of stock acquired prior to that time as the basis for determining profit or loss. Article 39, Regulations 45.

But the regulations were amended in 1922 by T. D. 3206, and accordingly the Commissioner ruled that the value of the stock must be reduced proportionally by the quotient basis because the taxpayer had acquired 75,000 additional shares in 1919 by virtue of its stock rights. On paper, then, the Commissioner determined that the taxpayer had made a large profit by the exchange.

The trustees of the Widener estate completely dominated the taxpayer. They owned and controlled it. The purpose, whatever it may have been, for the purchase of the taxpayer, had been served. In 1920 there seemed no longer to be any need for its existence, and so the trustees were evidently proceeding to wind up its affairs in an orderly fashion. Without question the transaction might have taken any form that the trustees desired.

No cash was exchanged for the stock. The taxpayer's assets had been materially reduced and it was considered sound by the trustees to substitute other securities for the bonds of the taxpayer held by the charity. Thus, the estate obtained the bonds from the charity, and, to reduce further the taxpayer's capital structure, the bonds were surrendered by the estate to the taxpayer and canceled. Obviously, in actual dollars and cents, it made no difference to the estate, itself, whether or not they obtained anything in return; but, in order to balance the books, the block of British-American Tobacco stock was taken, as its then value was substantially the same as on March 1, 1913, and was the largest single block standing in the taxpayer's name.

The stock was transferred, and, to offset the balance due the taxpayer on the exchange, it was given credit on its books. The result of the transaction produced no gain, nor loss, nor income to either the taxpayer or the Widener estate.

The Board of Tax Appeals was of the opinion that "the form which the transaction took truly represents the transaction which took place," that is, that the taxpayer actually received a profit of $1,055,953.12. But in this the Board is mistaken. The profit resulting to the taxpayer is illusory and nonexistent. The law is interested in an income from which an economic benefit may be realized. The exchange resulted in a mere paper profit, and this was made possible only because the regulations were changed some two years after the transaction.

The estate owned the taxpayer, and was in control and possession of all of its property. In substance, the taxpayer in this case

was a mere agent of the Widener estate and did not realize any taxable profit from this transaction, and so the order of redetermination of the Board of Tax Appeals is reversed.